## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| Southern Ute Indian Tribe<br>a federally recognized Indian tribe,<br><br>Plaintiff,<br><br>v.<br><br>JARED POLIS, in his official capacity as<br>Governor of Colorado,<br><br>And<br><br>CHRISTOPHER SCHRODER, in his official<br>capacity as Director of the Colorado Division<br>of Gaming,<br><br>Defendants. | Civil Action No. 24-CV-_____ |

## VERIFIED COMPLAINT

## OVERVIEW

1.     Plaintiff the Southern Ute Indian Tribe ("Tribe") is a sovereign and federally recognized Native American tribe located in southwestern Colorado.  In 1993, the Tribe entered into its first gaming compact with the State of Colorado and began to engage in Class III gaming within the exterior boundaries of the Southern Ute Indian Reservation ("Reservation") under the Indian Gaming Regulatory Act, 25 U.S.C. §2701 *et seq.* ("IGRA").  In 1995, that compact was amended and approved by the Department of Interior ("Gaming Compact," Exhibit A hereto).  Subsequently, the Tribe opened the Sky Ute Casino Resort on the Reservation.  This casino is regulated by the Southern Ute Division of Gaming ("SUDOG"), not the Colorado Division of Gaming ("CODOG"), which has only limited and strictly ministerial powers under the Gaming Compact.  The Tribe is regarded as sophisticated, professional and successful, enjoys a rare AAA

bond rating, and, for nearly three decades, has always run and regulated a clean and reputable gaming business.[1]

2.      The Gaming Compact recognizes the Tribe's authority to regulate and manage its own gaming and establishes the Tribe's authority to conduct gaming so long as the Tribe does so with "those gaming activities and bet amounts that are identical to the activities and bet amounts that are authorized in the State of Colorado." Gaming Compact at §§ 2(f), 3(a). In other words, pursuant to its inherent sovereign authority, the Tribe may engage in any gaming activity like that which is authorized elsewhere in Colorado so long as the Tribe's gaming activity mirrors the Colorado bet amounts.

3.      On May 1, 2020, sports betting became legal under the Colorado Sports Betting Law, C.R.S. § 44-30-1501 *et seq*. This legislation made no mention of tribal gaming. The Colorado legislature, noting the "the special governmental relationships and the unique political status" of the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe, created the Colorado Commission of Indian Affairs ("CCIA") in 1976 to serve as the official liaison between the Colorado state government and the Ute Tribes. In particular, CCIA's role included reviewing all pending and proposed legislation affecting the Tribes and to "coordinate intergovernmental dealings between tribal governments and [the] state." C.R.S. 24-44-101 *et seq*. At no time while the legislation was pending or at any time until shortly before internet sports betting became legal in Colorado did the State make any effort to meet with Tribe to question the ability of the Tribe to engage in internet sports betting throughout the State, despite the Compact's clear language. This was a sharp departure from customary practice in Colorado, which has generally maintained close and respectful ties with resident Indian tribes and consulted them on matters of mutual concern.

[1] Fitch Ratings, Fitch Affirms Southern Ute Indian Tribe, CO's IDR and Series 2007 VRDBs at 'AAA' (March 1, 2024), https://www.fitchratings.com/research/us-public-finance/fitch-affirms-southern-ute-indian-tribe-co-idr-series-2007-vrdbs-at-aaa-01-03-2024. Ex. B.

The State officially met with the Tribe for the first time on the subject just days before the Colorado Sports Betting Law went into effect. The State previously had made no mention that it had any concerns or opposed the Tribe taking sports bets from anywhere in Colorado as authorized by the Colorado Sports Betting Law and the Gaming Compact. This was bad faith.

4.       The language of the Compact is clear and authorizes the Tribe to conduct any gaming otherwise legal in Colorado, so the Tribe proceeded to establish its sports betting offerings apace, including establishing its regulatory framework and hiring appropriate vendors to assist with operations that had been legalized by the Colorado Legislature, executed by Governor Polis and ratified by a vote of Coloradoans in 2019. The Tribe adopted the Southern Ute Sports Betting Rules ("Tribal Sports Betting Rules"), which were modeled off the comparable Colorado regulations and incorporate the same restrictions and protections found therein. The Tribe maintained geofencing so that only bettors physically located in Colorado could use it, and contracted with a vendor to provide sports betting advisory services and process payments. In June 2020, the Tribe launched the Sky Ute Sportsbook, a modest online sports betting operation.

5.       At the direction of Governor Polis, CODOG, in violation of IGRA, Colorado's own clear commitments enshrined in the Gaming Compact and almost thirty years of historic practice, has taken the position that Colorado, not the Tribal Gaming Commission, has the authority to regulate the Sky Ute Sportsbook.

6.       Since 2020, CODOG has baselessly rejected the Tribe's careful legal explanations and patient efforts to educate the Polis Administration about tribal sovereignty. Instead of admitting their plain legal error and backing down, the Polis Administration has pressured the Tribe's principal vendor, threatening its Colorado licensure if it provided off-Reservation services to the Tribe without ever engaging the Tribe at all.

7.      This attempt to bring Tribal gaming under State regulation is illegal, offensive and pointless.  The Tribe is a sovereign Indian nation that has occupied its homeland since time immemorial and, as such, enjoys a sovereign right to regulate its own commercial activities as it sees fit consistent with its binding Gaming Compact with Colorado.  Furthermore, the Tribe has been successfully operating its own gaming for thirty years without incident, along with its other successful, highly regulated commercial enterprises.  There is no basis for the State to imply that the Tribe is not fully capable of regulating its own businesses pursuant to Tribal and federal laws.

8.      The State's disregard for the binding Gaming Compact is motivated by money. Sports betting regulated by Colorado is subject to a 10% tax, whereas no such tax could ever apply to Tribal gaming under federal law.  Therefore, the State sought to freeze the Tribe out of internet sports betting.  Stymied by the 1992 Taxpayer's Bill of Rights (TABOR) Amendment to the Colorado's Constitution, Governor Polis has, throughout his Administration, sought to create other dedicated sources of revenue, and the dedication of sports betting revenues to water projects is just one example.  The problem in this instance is that Governor Polis illegally and improperly sought to freeze the Tribe out of the broader Colorado sports betting market by, among other things, discouraging  vendors from doing business with the Tribe.  While the Tribe's principal vendor did not ultimately succumb to that pressure from the Polis Administration, the State's disregard for the Gaming Compact and IGRA, the belated challenge by the Administration to the Tribe engaging in internet sports betting throughout the State, and the unnecessary and unfair burden imposed on tribal gaming in this State, made sports betting operations challenging and more expensive for the Tribe.  The State's wrongful legal posture also threatens the Tribe's future sports betting activity and other potential future activities under the Gaming Compact.

9.      The anti-sovereignty approach of Defendants—seeking to unlawfully control the Tribe's governmental activities and control the use of the Tribe's money—is shocking and entirely

unjustified.  Upon information and belief, the Polis Administration has disregarded the legal advice of the Colorado Attorney General in maintaining this position.  Governor Polis is seriously and clearly wrong.

10.     The Tribe seeks a declaration that Tribal Sports Betting Rules, and the off-Reservation sports betting by the Tribe they regulate, are fully compliant with (1) the Indian Gaming Regulatory Act, (2) the Gaming Compact entered into between the State and the Tribe, as approved by the Department of Interior, and (3) the Colorado Sports Betting Act, and also seeks an injunction against further interference by the Polis Administration with the Tribe's sports betting operations.  The Tribe also seeks an order enjoining continuing bad faith negotiations by Governor Polis.

## I.  PARTIES

11.     Plaintiff is a federally recognized Indian tribe.  *See* 89 FED. REG. 944, 946 (January 8, 2024) (providing periodic list of all federally recognized Indian tribes in the United States).  The Tribal government is headquartered at 356 Ouray Drive, Ignacio, Colorado 81137 on the Southern Ute Indian Reservation.

12.     Jared Polis is Governor of Colorado and is being sued in his official capacity.

13.     Defendant Christopher Schroder is the Director of CODOG, established by C.R.S. § 44-30-201, and is being sued in his official capacity.

## II. JURISDICTION, VENUE AND STANDING

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this case brings claims under federal law, specifically the Indian Gaming Regulatory Act, 25 U.S.C. §2701 *et seq*. ("IGRA").  "The general federal-question statute, 28 U.S.C. § 1331, gives a district court subject matter jurisdiction to decide any claim alleging a violation of IGRA."  *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 788 n.2 (2014).

15.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391 because all parties have a principal place of business in Colorado and the events and omissions that give rise to this Complaint took place in Colorado.

16.     The Gaming Compact provides that "the complaining Party may invoke arbitration," however this language is merely permissive and does not compel a party to select an arbitral forum if it would prefer federal court.  Gaming Compact § 12.

### III.  FACTUAL ALLEGATIONS

#### A.  The Indian Gaming Regulatory Act

17.     "Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978)(quoting *Worcester v. Georgia*, 6 Pet. 515, 559 (1832)).

18.     "Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." *United States v. Wheeler*, 435 U.S. 313, 323 (1978)(abrogated by statute on other grounds).  "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in this Nation's history." *McGirt v. Oklahoma*, 591 U. S. __ (2020), Slip Op. at 33 (quoting *Rice v. Olson*, 324 U. S. 786, 789 (1945)).

19.     "The Court has consistently recognized that Indian tribes retain attributes of sovereignty over both their members and their territory, and that tribal sovereignty is dependent on, and subordinate to, only the Federal Government, **not the States**." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987)(quotations omitted, emphasis supplied).

20.     This includes the regulation of gaming. *Id*. at 222 ("State regulation would impermissibly infringe on tribal government, and this conclusion applies equally to the county's attempted regulation of the Cabazon card club").

21.     In response to the *Cabazon* decision, Congress enacted IGRA, which largely reaffirmed tribes' inherent and historic powers, but created some limited scope for state involvement.   Specifically, it provided that in states where Class III gaming is consistently forbidden for all purposes and by all persons and entities, it may also be forbidden on tribal land, but that if a state elected to permit parties to engage in Class III gaming then it would be required to negotiate in good faith with any interested tribe a gaming compact that would specify how certain enumerated areas of tribal gaming would be regulated.   *Northern Arapaho Tribe v. Wyoming*, 389 F.3d 1308, 1311 (10th Cir. 2004).  Under IGRA, "if a state permits Class III gaming … that state must negotiate a compact for those games even if state law restricts the sponsors or purposes of such gaming." *Id.* at 1313.  In sum, IGRA provided states only with a binary choice— to allow gaming within the exterior boundaries of the state or not.  IGRA did not confer on states any regulatory power over tribes.

22.     "The Indian Gaming Regulatory Act (IGRA or Act), 102 Stat. 2467, 25 U.S.C. § 2701 *et seq*., creates a framework for regulating gaming activity on Indian lands." *Bay Mills*, 572 U.S. at 785.

23.     "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a state which does not, as a matter of criminal law and public policy, prohibit such gaming activity." 25 U.S.C. § 2701(5).

24.     Class III gaming is legal when: (1) "such activities are …authorized by an ordinance or resolution that is adopted by the governing body of the Indian tribe having jurisdiction over such lands;" (2) the reservation is "located in a State that permits such gaming for any purpose by any person, organization, or entity;" and (3) when, "conducted in conformance with a Tribal-State compact entered into by the Indian tribe."   25 U.S. Code § 2710(d).

25.     There is nothing in the text or structure of IGRA that would prohibit a tribal-state gaming compact from authorizing online sports betting that would enable customers to access sports betting facilities located on a tribe's reservation from personal devices located elsewhere or to otherwise expand tribal sovereign and authority beyond what is mandated by IGRA. *W. Flagler Assocs. V. Haaland*, 71 F.4th 1059, 1065 (D.C. Cir. 2023), *cert denied*, 144 S.Ct. 10 (2024)(upholding hub-and-spoke exclusive online sports betting structure agreed between Florida and the Seminole Tribe whereby the Seminole Tribe accepts on-reservation bets by online bettors anywhere in the state of Florida).

**B.  The Gaming Compact**

26.     In 1995, the Tribe and the State entered into the amended, and operative, Gaming Compact, which was duly approved by the United States Department of the Interior under IGRA and remains in force.  This superseded the original, 1993 gaming compact.

27.     In keeping with what was then Colorado's longstanding policy of supporting the development and self-government of the Indian tribes located in Colorado, this Gaming Compact enshrines the Tribe's sovereign right to engage in any gaming activities that are otherwise legal within the State and to retain the full proceeds of such gaming to support the Tribe's government functions and priorities.

28.     "[T]he Tribe may conduct any or all Class III Games that are Explicitly Authorized by the laws of the State, each game having a maximum single bet as Explicitly Authorized by State law."  Gaming Compact  § 3(a).

29.     "'Explicitly Authorized' means, with respect to gaming activities and bet amounts, those gaming activities and bet amounts that are identical to the activities and bet amounts that are authorized in the State of Colorado."  Gaming Compact § (1)(f).

30.     This provision is stated in the present tense, permitting such gaming activities as "are authorized." *Id*. Thus, as Colorado has expanded the gaming activities that are lawful within the state, these new categories have also automatically become lawful for the Tribe and its gaming enterprise by operation of law.

31.     Under the Gaming Compact, the Tribe takes the primary responsibility for regulating and managing its own gaming enterprises, and CODOG has only limited powers to review the decisions made by the Tribe and intervene if necessary or if the Tribe requests assistance. Similarly, Tribal law enforcement is responsible for maintaining public safety at the facilities, although cooperative arrangements and cross-deputization agreements with adjacent counties are permitted and encouraged. *See e.g*., Gaming Compact § 4.

32.     It is the Tribe, not the State, that is responsible for licensing gaming facilities, and there is nothing in the Gaming Compact that would permit the State to require the Tribe to apply for a Colorado license. There are some administrative limitations which permit the State engagement in criminal background checks and to assure itself that other legitimate, enumerated regulatory requirements are being enforced, but these are strictly ministerial and administrative and do not confer decision-making power or discretionary authority. Gaming Compact § 5.

33.     There is no provision in the Gaming Compact that would permit the State to demand that a share of the funds be diverted from the Tribe's sovereign management and control to any other public or private purpose. *See* Gaming Compact § 13. Colorado is unique among the states in that it never bargained for any revenue sharing in its gaming compacts, and since the passage of IGRA in 1988—until the Polis Administration—there has been a strong bipartisan consensus that the State would work with the Tribe with regard to gaming and respect the Tribe's financial and regulatory independence. There is a compelling reason for this given the significant governmental services the Tribe provides to Colorado residents and the expense the Tribe bears

for ensuring regulatory requirements are met, particularly in the area of environmental management, for which the state provides little or no reimbursement.

34.     Since IGRA's enactment in 1988, every Colorado Governor <u>prior to Governor Polis</u> was respectful of the Tribe's sovereignty and never sought to intrude on the Tribe's gaming activities or revenues in any way.

35.     In recognition of the State's respectful attitude and in a spirit of comity, the Tribe did not require the Colorado State Lottery to obtain a license from the Tribe, although lottery tickets were regularly sold in stores on Tribal land until approximately one year ago when the Tribe pointed out the hypocrisy of that juxtaposition to Governor Polis.  Until Governor Polis' abrupt and illegal policy shift seeking to exert nonexistent State regulatory power over the Tribe and demand money from the Tribe, the three-decade course-of-dealing had been that the Tribe and the State have each left the other's gaming activities up to the sister government.

### C.  The Colorado Sports Betting Act

36.     In November 2019, the people of Colorado approved Proposition DD, now codified at C.R.S. § 44-30-1501, which legalized sports betting in Colorado.

37.     This legislation specifically legalizes "Internet sports betting operation[s]" defined as "a sports betting operation in which wagers on sports events are made through a computer or mobile or interactive device and accepted by an internet sports betting operator."  C.R.S. § 44-30-1501(4).

38.     Although Proposition DD was a referred measure, drafted by the State General Assembly and presented to the people of Colorado, there is no mention of tribal gaming in the legislation, although gaming in the cities of Central, Black Hawk, and Cripple Creek is specifically addressed.

### D. The Launch of Tribal Sports Betting and the State's Response

39.     As noted above at Paragraph 4, the Tribe began preparing its sports betting market entry in 2019, during the legalization process.  In March, 2020, the State and Tribe scheduled a call to discuss sports betting, following the State's outreach.  The Tribe had all of its necessary representatives available to engage in those discussions.  However, no representative of CODOG or the Colorado Department of Revenue was available for the call, and the sole representative of the State could not identify any concerns with the Tribe engaging in sports betting.  The Tribe requested that if there were any such concerns, that they be identified in writing.  Nothing was received.

40.     On March 25, 2020, another meeting was scheduled between the State and the two Colorado tribes to discuss sports betting.  The purpose of the meeting, as described by the State, was to "share [everyone's] respective understandings of relevant rules and regulations and to identify additional conversations/action items needed to ensure that online sports betting can be implemented smoothly on May 1st."  Ex. C.  Once again, all necessary representatives of the Tribe were available to discuss this issue.

41.     On March 24, the State cancelled the meeting.  *Id*.  No reason was given.  However, the State again assured the Tribe it would provide a written outline of any concerns the State might have with the Tribe engaging in internet sports betting.

42.     On April 16, 2020,  SUDOG provided CODOG with a Notice of Implementation of the Tribal Sports Betting Rules.  Ex. D.

43.     The Tribal Sports Betting Rules were largely modeled off the State's rules and drafted to conform to the requirements of the Colorado and federal law.  Compare Exhibit E with 1 C.C.R. § 207-2-1.

44.     For example, like Colorado, the Tribe does not permit betting on high school sports events, requires contractors to pass criminal background checks and conflict of interest screenings, has customer screening in place to prevent betting by underaged persons, people with inside knowledge and others who would not be able to participate under the Colorado statute, and does not permit bets to be placed from outside the state of Colorado. *Id.*

45.     The following day, on April 17, 2020, the Tribe received a letter from CODOG in which it was stated, "the Division would like to find a solution that doesn't put any of our partners in conflict with the IGRA and the Unlawful Internet Gambling Enforcement Act ("UIGEA"). There has always been a great working relationship between the Tribe and the Division and that should be a great foundation to find a positive legal solution to internet sports betting. We look forward to our conversation."  CODOG further suggested for the first time that Internet betting was limited to the Reservation boundaries. Exhibit F.

46.     In late April, the Tribe finally had discussions with CODOG and the representatives of the Colorado Attorney General's office.  This was in the final weeks  before implementation of sports betting in the state.  The Tribe provided full disclosure regarding the activities in which it planned to engage.  The culmination of those meetings was that the State would have internal discussions and would get back to the Tribe with any concerns.

47.     Assurances were provided by Dan Hartman, the Director of CODOG, that there was no intention of interfering with the Tribe's internet sports betting operation.  CODOG's email of April 17 referred to plans for "great follow-up meetings," particularly around the Tribe's Sports Betting Rules.  Ex. F.   That meeting regarding the Rules was not scheduled.

48.     On June 2, 2020,  the Tribe launched Sky Ute SportsBook, a sports betting operation conducted through its gaming enterprise.

49.     At that time the casino itself was closed and shuttered and the Covid lockdowns were in force.

50.     CODOG has taken the position that the Gaming Compact does not apply to the Tribe's sports betting operation and demanded that it secure a license from the Colorado Gaming Commission.  *See, e.g.* Letter dated May 17, 2021 from Dan Hartman to David Smith, attached to this Verified Complaint as Exhibit G.

51.     On information and belief, there has never been any actual concern from the State with the technicalities of the Tribe's operation or its compliance with regulatory provisions designed to protect public health and safety.  Rather, Governor Polis has improperly sought to exclude the Tribe from the Colorado sport betting market because the State is powerless to tax the Tribe or require the Tribe to pay any revenues whatsoever to the State.  Governor Polis has sought to manipulate the market so he can extract the maximum amount of taxes from sport betting activities with no care, concern or respect for the negative economic consequences for Colorado's Tribal communities, who are limited under federal law to using gaming revenue for governmental operations and the general welfare of Tribal members.

52.     The Tribe does not pay any portion of its gaming proceeds to the State because this is not required by the Gaming Compact or IGRA and because it uses those funds to provide basic public services for its community.  Colorado is unique among the states in not requiring revenue sharing from tribal gaming because of the financial benefits the Tribe provides the State.

53.     Faced with the clear authority of the Gaming Compact, the State tried to put off the Tribe, delaying engagement and belatedly asserting its legal position.  Instead, the State quietly tried to shut down the SkyUte Sportsbook by sending a threatening letter to the Tribe's key vendor. Specifically, on June 16, 2020, CODOG sent a letter to US Bookmaking ("USB"), which provided advisory services to the Sky Ute Casino on sports bets.  The letter stated that "Based on an initial

review of your activities, we believe that your company is participating in sports betting in Colorado on behalf of the Southern Ute Tribe without complying with Colorado gaming law." This Letter to USB is attached here as Exhibit H.

54.     The Ute Mountain Ute Tribe's proposed vendor received a similar letter.  This Letter to IGT is attached here as Exhibit I.   On information and belief, this vendor responded by discontinuing its relationship with the Tribe with respect to statewide internet sports betting.

55.     The effect of the letters, without consultation, has been devastating for tribal sports betting in Colorado.  With respect to the Southern Ute, it has required the Tribe to justify the legality of its operations.  As to the Ute Mountain Ute Tribe, its vendor delayed and limited implementation of sports betting and in light of the State's correspondence.

56.     The State's admonition to vendors was clear: "[T]he Division considers such gaming occurring off Tribal lands but within the state of Colorado, and the facilitation of such gaming, to be illegal."   Ex. H; Ex. I.

57.     Whether or not the Court adopts the Tribe's position that its Sky Ute SportsBook Betting Enterprise was fully lawful, it was conducted in a good faith effort to comply with law and in accordance with a plausible legal theory.  Pressure tactics such as threatening to take action against a vendor of the Sky Ute SportsBook Betting Enterprise do not constitute good faith negotiations as mandated by IGRA.  25 U.S.C. § 2710(d)(3).

58.     In a letter dated May 17, 2021, Dan Hartman, then-Director of CODOG, proposed that the arrangement with the Tribe be modified to more closely resemble that of the state of Michigan, a state that has historically had a much less favorable approach to tribal gaming than the one taken by Colorado and resultantly negotiated its tribal gaming compacts very differently than Colorado.  *See* Ex. G.  Specifically, the Tribe would be "eligible to obtain a sports betting license" from the State, but could not license and regulate its own operations as is guaranteed under

the Gaming Compact, and would need to subject its operations to discretionary authority of the State. *Id.* Such license would be "conditioned upon" "a payment in an amount equal to 10% of net sports betting proceeds for bets placed with the Tribe's operation by bettors located off Tribal land" and submission to the regulatory jurisdiction of the State. *Id.*

59.     Mr. Hartman's May 17 letter further stated, "The issuance of a sports betting license to a Tribe is conditioned upon the following agreements . . . The Tribe permits, to the extent necessary, the Division and Colorado Limited Gaming Control Commission to enforce the Act and accompanying regulations concerning consumer protection; (2) permits the Colorado Attorney General and other appropriate State agencies to bring claims protecting Colorado consumers arising out of the Tribe's off-Tribal land sports betting activity; and (3) permits consumers of the Tribe's off-Tribal land sports betting activity to resolve disputes in the same or similar manner as with other licensed operators"). *Id.* Although it does not use the phrase "waiver of sovereign immunity," that is what this requirement is demanding. In fact, CODOG was attempting to subject the Tribe to civil jurisdiction in every county of the state while non-Tribal sports betting operators were being permitted to litigate claims with consumers in their home jurisdictions or the jurisdiction of their choice.

60.     None of these requirements appear in the Gaming Compact that was formally negotiated between the Tribe and the State and approved by the Department of Interior, and none have been requested by any other Colorado administration in the decades since the Gaming Compact was negotiated and came into effect.

61.     This license would place the operation under the jurisdiction of CODOG, rather than SUDOG, in violation of the Gaming Compact.

62.     The Tribe would be required to pay a full ten percent of its proceeds to the State, although the State would agree to place some portion of this money in a "designated fund" for water projects "impacting tribal lands." *Id*.

63.     <u>Roughly a year and a half into Colorado sports betting and its improper threatening campaign to the Tribe's vendor</u>, on October 6, 2021, the State, through CCIA, and the Colorado Department of Revenue, finally sent an invitation for "a formal consultation" regarding "[s]ports betting within the state of Colorado and within Southern Ute and Ute Mountain Ute Tribal casinos." Letter dated October 6, 2021, attached as Exhibit J. At that point, the Colorado sports betting market was already saturated and the Tribe had been wrongly frozen out of the opportunity to participate in it by the Polis Administration. The consultation was an after-the-fact charade put on by the State after the Governor had secured a monopoly of non-Tribal gaming enterprises by blocking the Tribe's sport betting activities.

64.     Nonetheless, the parties met on the Reservation on April 29, 2022 and exchanged proposals, following a long delay due to changes in the Governor's counsel.

65.     However, in the five years since the Colorado Sports Betting Law was adopted, the State has refused to pull back from its baseless requirements that the Tribe hand over ten percent of its sports betting revenues to the State or impose on itself a 10% assessment. Numerous meetings, communications and discussions have met with the Polis Administration's complete intransigence.

66.     During this time, there have been no incidents regarding consumer protection or public safety that were not handled promptly and professionally by the experienced Tribal staff and by the Tribal Gaming Commission.

67.     While the Tribe's vendor did not ultimately succumb to that pressure from the Polis Administration, the State's disregard for the Gaming Compact and IGRA made sports betting

operations challenging and more expensive for the Tribe, requiring extensive reassurance of its vendor and suppliers and unnecessarily placed a cloud of uncertainty over Tribal sports betting in Colorado.  The Tribe has spent years trying to educate the Governor and his counsel about the Gaming Compact, to no avail.  Having been hamstrung by the Polis Administration's improper efforts to restrict Tribal sports betting and having missed out on effective implementation in 2020 and 2021, the Tribe encountered a quickly over-saturated Colorado sports betting market populated by major industry players who were happy to pay the State ten percent of their revenues.  Faced with the reality that Governor Polis had effectively frozen the Tribe out of the broader Colorado sports betting market, thereby restricting competition and securing the State 10% of virtually the entire Colorado market, the Tribe determined to close the Sky Ute Sportsbook in July 2023.  The State's wrongful legal posture also threatens the Tribe's future sports betting activity and other potential future activities under the Gaming Compact.  Having exhausted its efforts to persuade Governor Polis on a government-to-government basis, the Tribe seeks this Court's recognition of the plain language of the Gaming Compact and an Order restricting further breach of the Gaming Compact and IGRA by Governor Polis.

68.    Like the State of Colorado, the Tribe has broad and sweeping powers of civil regulation, and the Gaming Compact specifically recognizes that it can conduct, license and regulate any gaming activity legal in Colorado, as it has done, without incident, for decades.

69.    Colorado's actions are illegal and should be enjoined.

## CLAIM ONE
### DECLARATORY JUDGMENT UNDER IGRA, 25 U.S.C. § 2710, AND THE GAMING COMPACT

70.    Plaintiff realleges and incorporates by reference the allegations contained in this Complaint.

71.     Class III gaming is legal when: (1) "such activities are…authorized by an ordinance or resolution that is adopted by the governing body of the Indian tribe having jurisdiction over such lands;" (2) the reservation is "located in a State that permits such gaming for any purpose by any person, organization, or entity;" and "(3) when "conducted in conformance with a Tribal-State compact entered into by the Indian tribe."  25 U.S. Code § 2710(d).

72.     The Sky Ute SportsBook Betting Enterprise, as the Tribe had conducted and intends to conduct in the future, is compliant with these three requirements.

73.     It is governed by an ordinance adopted by the Tribe's government, located in a state that authorizes online sports betting for a wide range of entities, and is conducted in conformance with a Gaming Compact that authorizes the Tribe to conduct any gaming activity lawful within the State of Colorado and to exercise its own licensure and regulatory authority.

74.     This Court should issue a Declaratory Judgment that the Tribal Sports Betting Rules, and the Tribe's off-Reservation sports betting activity regulated by those rules, are fully compliant with (1) the Indian Gaming Regulatory Act, (2) the Gaming Compact entered into between the State and the Tribe, and (3) the Colorado Sports Betting Act, and also enjoin against further interference by the Polis Administration with the Tribe's sports betting operations.  The Tribe also seeks an order enjoining continuing bad faith negotiations by Governor Polis.

**CLAIM TWO**
**INJUNCTIVE RELIEF**
**IGRA, 25 U.S.C. § 2710, AND THE GAMING COMPACT**

75.     Plaintiff realleges and incorporates by reference the allegations contained in this Complaint.

76.     Class III gaming is legal when: (1) "such activities are …authorized by an ordinance or resolution that is adopted by the governing body of the Indian tribe having jurisdiction over such lands;" (2) the reservation is "located in a State that permits such gaming for any purpose

by any person, organization, or entity;" and "(3) when " conducted in conformance with a Tribal-State compact entered into by the Indian tribe."  25 U.S. Code § 2710(d).

77.     The Sky Ute SportsBook Betting Enterprise, as it existed and as the Tribe intends to move forward in the future, is compliant with these three requirements.

78.     It is governed by an ordinance adopted by the Tribe's government, located in a state that authorizes online sports betting for a wide range of entities, and is conducted in conformance with a Gaming Compact that authorizes the Tribe to conduct any gaming activity lawful within the State of Colorado and to exercise its own licensure and regulatory authority.

79.     This Court should issue an injunction requiring Colorado to refrain from interfering with the Sky Ute SportsBook Betting Enterprise, except to the extent that it is exercising its legitimate oversite powers under the Gaming Compact, as expressly and strictly limited therein.

## PRAYER FOR RELIEF

WHEREFORE, based on the above allegations, Plaintiff respectfully request that this Court grant the following relief:

A.  A final judgment in favor of Plaintiff declaring that the Sky Ute SportsBook Betting Enterprise is lawful;

B.  An injunction requiring the State to cease and desist from its efforts to interfere with the Sky Ute SportsBook Betting Enterprise and its business relationships;

C.  An injunction requiring the State to cease and desist from its flagrant violation of the Gaming Compact and attempts to unilaterally rewrite the Gaming Compact contrary to binding federal law;

D.  An injunction requiring the State to cease and desist its bad faith efforts to unilaterally and illegally rewrite the Gaming Compact by attempting to impose any revenue-sharing requirement that does not exist in the Gaming Compact;

E.  Judgment in favor of Plaintiff and against the Defendants on all claims;

F.  An order awarding Plaintiff's costs, interests, and attorneys' fees incurred in connection

with the commencement and prosecution of this action; and

G.  Such other relief as the Court deems just and reasonable.

**GREENBERG TRAURIG, LLP**

*s/Jennifer H. Weddle*
Troy A. Eid
Jennifer H. Weddle
Harriet McConnell Retford
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300 Denver, Colorado 80202
(303) 572-6500
eidt@gtlaw.com
weddlej@gtlaw.com
retfordh@gtlaw.com
*Counsel for Plaintiff*
*Southern Ute Indian Tribe*

**VERIFICATION**

I, the Honorable Melvin J. Baker, as the duly-elected Chairman of the Southern Ute Indian Tribe, the Plaintiff in this matter, verify this Complaint, and that I have read this Complaint and the facts stated herein are true and correct to the best of my knowledge and belief. I base this certification on my personal knowledge and knowledge related to me by employees and agents of the Southern Ute Indian Tribe.

Dated this 8th day of July 2024,

Hon. Melvin J. Baker, Chairman
Southern Ute Indian Tribe