IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 1:24-cv-01886-GPG-NRN

SOUTHERN UTE INDIAN TRIBE, a federally recognized Indian tribe, and
UTE MOUNTAIN UTE TRIBE, a federally recognized Indian tribe,

    Plaintiffs,

v.

JARED POLIS, in his official capacity as Governor of Colorado, and
CHRISTOPHER SCHRODER, in his official capacity as Director of the Colorado Division of Gaming,

    Defendants.

# ORDER

Before the Court is Defendants' Motion to Dismiss Second Amended Complaint (D. 61). This Order examines the jurisdictional limits of Indian gaming, the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.*, and the *Ex parte Young* doctrine. IGRA was enacted in 1988 to regulate the conduct of gambling on Indian lands. The thirty-seven years since enactment of IGRA have seen massive technological advances in all aspects of life. As applicable to gambling, no longer does a bettor have to go to a casino to gamble. Instead, because of the ability to place an online bet from a cellular phone or other electronic device, bettors can engage in gambling from almost anywhere. This rapidly expanding method of gambling now makes up a significant percentage of gambling revenue. Unsurprisingly, a myriad of casinos, including those run by

1

Indian tribes on Indian lands, wish to add online sports betting to their panoply of gambling offerings so that they are not shut out of the potential concomitant revenue stream.

The legal tension this creates is that regulation of Indian gaming is tied to Indian land. If gaming is on Indian land, IGRA applies. If gaming is off Indian land, IGRA does not apply. While not without its definitional hurdles, a retrospective look back to when IGRA was enacted in 1988 shows a simpler technological time when both the gambler and the game, e.g., a roulette wheel, were likely in the same place at the same time. If the gambler and roulette wheel were on Indian land, IGRA applied. However, in 2025, a gambler can be in Denver and the electronic game processed through a computer server on Southern Ute Indian Tribe land or Ute Mountain Ute Tribe land. Where then does the gaming occur?

There is no dispute about the relevant facts between the Parties. The Parties agree that that the Tribes would be accepting sports bets from bettors not on Indian land. The State of Colorado acknowledges that, if a bettor was placing a sports bet from Indian land, that would constitute gaming on Indian land and IGRA would apply. The Parties instead dispute what it means to be on Indian land for the purposes of IGRA, e.g., is the Indian land determination tied to the location of the bettor or to other factors such as the location of the computer servers or other relevant equipment. This is a legal determination for the Court to make. This Court finds that the gaming occurs where the bettor is located—in this context the location of the bettor is the only determining factor for whether gaming is on Indian land. If the bettor is on Indian land, the gaming activity is on Indian land and IGRA applies. If the bettor is off Indian land, e.g., in Denver, the bettor is not engaged in gaming on Indian land and IGRA does not apply.

That distinction is crucial in this action and fatal to the Tribes' case. The Tribes may only assert a cause of action against these Defendants if there has been an Eleventh Amendment waiver or if some doctrine applies such as *Ex parte Young* which would breach immunity. There has been no waiver. *Ex parte Young* only applies if gaming is occurring on Indian land and IGRA applies. The proposed gaming would be occurring off Indian land because the bettors would be off Indian land. Thus, IGRA does not apply, the *Ex parte Young* doctrine does not apply, and this matter must be dismissed for lack of subject matter jurisdiction.

This Court is well aware of the significant financial implications of this decision. A myriad of gambling houses offer legal sports betting in the State of Colorado. To engage in this service, they must remit 10% to the State. The State of Colorado has offered this possibility to the Tribes. By making this comparison, the Court in no way suggests that the Tribes and the various companies engaging in sports betting are in any way similarly placed. The Tribes are sovereign nations in their own right. However, their ability to offer gaming is confined by IGRA as is any waiver of immunity by the State of Colorado.

Therefore. the Court GRANTS the motion for the following reasons.

## I.  FACTS

This civil action arises from Plaintiffs' desire to engage in online sports betting in the state of Colorado.[1]  Plaintiffs, the Southern Ute Indian Tribe and the Ute Mountain Ute Tribe (collectively, the Tribes), are sovereign and federally recognized Native American tribes located principally in southwestern Colorado (D. 52 at ¶ 1). The Tribes operate casinos within the bounds of their respective reservations pursuant to IGRA and gaming compacts with the state of Colorado

---

[1] The Court draws the operative facts as set forth in Plaintiffs' Second Verified Amended Complaint (D. 52).

(*id.* at ¶¶ 2, 4, 38, 43).  IGRA grants tribes "the exclusive right to regulate gaming activity on Indian lands" if the gaming activity is not specifically prohibited by Federal or state law.  25 U.S.C. § 2701(5).  The gaming compacts authorize the Tribes to conduct class III gaming that is authorized by state law (D. 52 at ¶¶ 40, 44).

In November 2019, Colorado passed the Colorado Sports Betting Act, legalizing online and offline sports betting – a type of class III gaming – with certain limitations (*id.* at ¶ 48).  Colo. Rev. Stat. § 44-30-1501 *et seq*.  In response, the Southern Ute Indian Tribe began preparing to enter the online sports betting market, which included establishing a regulatory framework and hiring vendors (D. 52 at ¶ 52).  The Tribe intended to set up an online sports betting platform with servers located on the Tribe's lands that would accept bets placed from across the state (*id.* at ¶¶ 9, 15).[2]  The Tribe reached out to Colorado to discuss its plans (*id.*).  The Ute Mountain Ute Tribe did the same (*id.* at ¶ 65).  In March and April 2020, the Tribes had multiple meetings and correspondences with representatives of the state government and the Colorado Division of Gaming (CODOG) regarding their plans (*id*. at ¶¶ 52-62).  In late April, the Director of CODOG assured the Southern Ute Indian Tribe that CODOG had no intention of interfering with their online sports betting operation (*id.* at ¶ 61).

The Southern Ute Indian Tribe launched its online sports betting platform, the Sky Ute SportsBook, on June 2, 2020 (*id.* at ¶ 63).  Two weeks later, CODOG sent a letter to one of the Tribe's vendors stating, "[b]ased on an initial review of your activities, we believe that your company is participating in sports betting in Colorado on behalf of the Southern Ute Indian Tribe

---

[2] The Complaint does not describe the logistics of the Tribes' past or planned operations except to state that the servers associated with the Sky Ute Sports Book were located on the Southern Ute Indian Tribe's lands (D. 52 at ¶ 50 n.7).

without complying with Colorado gaming law" (*id.* at ¶ 70).  The letter clarified that "the Division considers such gaming, occurring off Tribal lands but within the state of Colorado, and the facilitation of such gaming, to be illegal" (*id.* at ¶ 73).  Despite the letter, the Southern Ute Indian Tribe and its vendor continued their relationship and operation of the Sky Ute SportsBook (*id.* at ¶ 72).  The Ute Mountain Ute Tribe also attempted to launch an online sports betting operation, but its online sportsbook vendor received a similar letter and opted to discontinue its relationship with the Tribe (*id.* at ¶ 71).

On May 17, 2021, the Director of CODOG sent a letter to the Southern Ute Indian Tribe proposing that the Tribe was "eligible to obtain a sports betting license" from the State but was not permitted to license and regulate its own sports betting operations (*id.* at ¶ 75).  Such a license would be "conditioned upon . . . a payment in an amount equal to 10% of net sports betting proceeds for bets placed with the Tribe's operation by bettors located off Tribal land" and submission to the regulatory jurisdiction of the State (*id.*) (internal quotation marks omitted).

The Tribes claim that Colorado's actions made their sports betting operations challenging and more expensive, effectively freezing them out of the sports betting market (*id.* at ¶¶ 80, 83).  Ultimately, the Southern Ute Indian Tribe decided to close Sky Ute SportsBook in July 2023 (*id.* at ¶ 85).  The Tribes filed the instant suit for declaratory and injunctive relief against Defendants Polis and Schroder on July 9, 2024, asserting subject matter jurisdiction under *Ex parte Young* (D. 2).  The Tribes argue that their desired sports betting activity is in compliance with IGRA and the Tribes' gaming compacts (*id.*).  Defendants move to dismiss the claims, arguing they are immune from suit under the Eleventh Amendment, the Tribes have not stated a claim under IGRA or the gaming compacts, and the claims are untimely (D. 61).

5

## II. LEGAL STANDARD

Because federal courts are courts of limited jurisdiction, a court, sua sponte, or a party may challenge subject matter jurisdiction at any stage of the proceedings. *See Harris v. Illinois-California Exp., Inc.*, 687 F.2d 1361, 1366 (10th Cir. 1982). Under Rule 12(b)(1), a party may seek dismissal for lack of subject matter jurisdiction in two forms: (1) facial attack or (2) factual challenge. For the first, the moving party may "facially attack the complaint's allegations as to the existence of subject matter jurisdiction." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004). When reviewing a facial attack, courts accept a complaint's allegations in the complaint as true. *See Pueblo of Jemez v. United States*, 790 F.3d 1143, 1148 n.4 (10th Cir. 2015) (citation omitted).

## III. ANALYSIS

Defendants bring a 12(b)(1) facial attack on subject matter jurisdiction, arguing that they are immune from suit under the Eleventh Amendment (D. 61 at 4). They argue that the *Ex parte Young* exception to the Eleventh Amendment does not apply because they have not violated a federal law (D. 61 at 5). The Tribes argue that in seeking to regulate their online betting activity, Defendants are violating IGRA, which is a federal law (D. 52 at ¶ 19).

The Court finds that the Tribes' suit does not fall under the *Ex parte Young* exception to sovereign immunity, and Defendants are immune from suit.[3] To determine if *Ex parte Young* applies, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."

---

[3] "Questions involving Eleventh Amendment immunity are questions of law" and thus appropriate for the Court to decide on a motion to dismiss. *See Cornforth v. Univ. of Oklahoma Bd. of Regents,* 263 F.3d 1129, 1131 (10th Cir. 2001).

*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 636 (2002). This inquiry "does not include an analysis of the merits of the claim." *Id.* at 637.

Here, the Court finds that the Tribes do not claim a violation of federal law. Colorado seeks to regulate the Tribes' collection of online bets placed from outside of reservation boundaries, which do not fall under the purview of IGRA. IGRA only applies to class III gaming activity occurring "on Indian lands." *Michigan v. Bay Mills Indian Cmty.,* 572 U.S. 782, 795 (2014) ("Everything—literally everything—in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else."). Online bets placed outside of reservation boundaries are not placed "on Indian lands" because online betting occurs where the bettor is located. Class III gaming activity occurs where the "activities actually involved in the playing of the game" take place. *Navajo Nation v. Dalley,* 896 F.3d 1196, 1207 (10th Cir. 2018) ("The Court's analysis in *Bay Mills* leads us to the clear conclusion that Class III gaming activity relates only to activities actually involved in the playing of the game, and not activities occurring in proximity to, but not inextricably intertwined with, the betting of chips, the folding of a hand, or suchlike."); *Bay Mills,* 572 U.S. at 792 ("'[C]lass III gaming activity' means just what it sounds like—the stuff involved in playing class III games."). For example, class III gaming involving rolling dice and spinning wheels occurs where the dice are rolled and the wheels are spun. *See Bay Mills,* 572 U.S. at 792 ("'[C]lass III gaming activity is what goes on in a casino – each roll of the dice and spin of the wheel.").

In the context of online gaming, the "activit[y] involved" in playing is the bettor's act of placing a wager through an electronic device. *See State of California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 967 (9th Cir. 2018) ("Consistent with the Supreme Court's holding in *Bay*

7

*Mills*, the act of placing a bet or wager [online] is the 'gambling in the poker hall'"). While the Tribes contend that the relevant act is the acceptance of a wager by a server located on Indian land, the Court disagrees (D. 52 at ¶¶ 14, 50).[4] *See Bay Mills*, 572 U.S. at 792 ("[T]he gaming activity is the gambling in the poker hall, not the proceedings of the off-site administrative authority."). Notably, all the "activities actually involved in the playing" of in-person class III games listed by the Tenth Circuit or Supreme Court are actions taken by the bettor, not the house. *See Dalley,* 896 F.3d at 1207; *Bay Mills,* 672 U.S. at 792. For online gaming, then, it would be inapposite to look to the sportsbook's actions rather than the bettor's actions.[5] In online gaming, the most closely analogous activity to rolling dice, betting chips, spinning a wheel, or playing cards is clicking a button to place a wager, setting the wager in motion. Therefore, the Court holds that online class III gaming activity occurs where the bettor, not the server, is located when he or she initiates the wager.

If Colorado were attempting to regulate the Tribes' acceptance of wagers placed within the bounds of their respective reservations, it would be overstepping into the Tribes' jurisdiction under IGRA. But, Colorado is only seeking to regulate the acceptance of wagers placed off the reservations and thus occurring off Indian land (*see* D. 68 at 10-11 ("Colorado does not permit its sports betting regime to reach into the Tribes' jurisdiction; similarly, the Tribes may operate a sports betting regime that solely receives bets from within their territorial jurisdictions.")).

---

[4] The Tribes argue that "[u]nder Colorado's sports betting law, the location of the bet is where the bet is accepted" (D. 52 at ¶ 50 (citing CODOG gaming regulations and the Colorado Sports Betting Act)). However, the Court does not address this argument as Colorado state law is irrelevant for the purposes of interpreting IGRA.

[5] In online gaming, the sportsbook is the entity accepting bets on sporting events.

8

Colorado's stance does not run afoul of IGRA. As a result, the Tribes do not claim a violation of federal law, and *Ex parte Young* does not apply.

The Court notes that while neither party argues that factual discovery is required to determine if online gaming is "on" or "off" Indian lands for the purposes of IGRA, discovery would not impact the Court's conclusion because the sole relevant fact for determining where online gaming occurs under IGRA is where the bettor is located when initiating the wager. Where the Tribes' servers were or would be located, money held, and decisions about odds made do not speak to where the activities involved in the playing of the game take place. Even assuming that every other activity involved in the operation of the Tribes' online gaming were to take place on Indian lands, so long as the bet is placed while the bettor is physically off Indian land, the gaming is not "on Indian lands" under IGRA. Therefore, discovery would not reveal any facts that would impact the Court's conclusion that *Ex parte Young* does not apply to the Tribes' suit.

## IV. CONCLUSION

Accordingly, Defendants' Motion to Dismiss Second Amended Complaint (D. 61) is GRANTED. It is FURTHER ORDERED that the Clerk of the Court shall close this case.

DATED October 23, 2025.

BY THE COURT:

Gordon P. Gallagher
United States District Judge